IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MARYANN LUCAS                                                              PLAINTIFF

v.                                                    CIVIL ACTION NO. 4:23-CV-206-SA-JMV

ALLEGIANCE SPECIALTY HOSPITAL
OF GREENVILLE, LLC                                                         DEFENDANT

### ORDER AND MEMORANDUM OPINION

MaryAnn Lucas filed her Complaint [1] against Allegiance Specialty Hospital of Greenville, LLC on November 2, 2023. She brings claims under the Family and Medical Leave Act of 1993 ("FMLA") and the Age Discrimination in Employment Act of 1967 ("ADEA"). Before the Court is Allegiance's Motion for Summary Judgment [48]. The Motion [48] has been fully briefed and is ripe for review. The Court is prepared to rule.

*Relevant Factual and Procedural Background*

Allegiance provides in-patient and out-patient care for patients suffering from mental and psychiatric health issues in the Mississippi Delta. Lucas began working at Allegiance in October 2007. At the time of her termination in May 2023, Lucas was the Program Director of Outpatient Services for Allegiance's Cleveland, Grenada, Greenville, and Hattiesburg locations. She was 57 years old at the time of her termination.

On May 8, 2023, Allegiance's Human Resources Coordinator Velma Melton received a complaint from an employee alleging that Lucas had been altering the employee's timecard to delete overtime hours. Melton sent Chief Human Resources Officer Danny Wagner an email notifying him of the complaint and asking him how to proceed.[1] Wagner advised Melton "to

---

[1] Melton carbon copied Michelle Lambert (corporate employee), Veronica Cochran (Director of Payroll), Vearnail Herzog (CEO), and Christopher Morris (corporate employee) on the email to Wagner.

investigate, get statements including [Lucas'], pull audit and hold accountable if confirmed." [48], Ex. 1 at p. 34.

Later the same day (May 8, 2023), Melton called Lucas and notified her that the company was investigating the allegation that she had altered timecards, and she asked Lucas to provide a written statement for the investigation. Lucas told Melton over the phone that she had changed timecards for employees who she alleged did not actually work overtime hours. Lucas provided a written statement wherein she discussed adjusting timecards, including "adjustments due to missing time, multiple punches in or out invalid times [sic], [and] time that staff forgot to request sick or vacation time and asked to add their sick or vacation time in the system." [48], Ex. 1 at p. 43. Lucas also alleged that she adjusted time when the staff asked her to only use the amount of vacation hours necessary to reach 80 hours and when an employee was mistakenly sent home without pay.

Lucas' statement did not specifically address the deletion of overtime hours to which she had admitted over the phone. Melton therefore requested that Lucas provide a revised statement and Lucas complied. In her revised statement, Lucas asserted that she adjusted overtime hours due to "blatant abuse of company's overtime," alleging that she had seen employees loitering outside after normal work hours when they were supposed to be off the clock. *Id.* at p. 44.

As will be discussed more fully hereinafter, at her deposition, Lucas testified that it was her job to make necessary corrections to timecards. However, she also testified it was against company policy to alter time.

Allegiance's investigation ultimately revealed that Lucas had altered 12 timecards from January 2023 through May 2023. On May 9, 2023, Melton emailed Wagner documentation retrieved during the investigation, and she asked him to "advise on disciplinary action." *Id.* at p.

46. On May 10, 2023, after instructing Melton to investigate further by collecting employee statements and determining the wages owed to each employee, Wagner told Melton, "We can look at everything when investigation is complete, but looking like probably termination." *Id.* at p. 45.

On May 11, 2023, Melton emailed Wagner employee statements and documentation for pay periods dating back to January 2023. Later that day, Wagner instructed Melton via email to meet with employees about the wages they were owed. Wagner's May 11 email also recommended terminating Lucas. *See id.* at p. 111 ("Then I recommend terminating MaryAnn.").[2] On Friday, May 12, 2023 at 1:46 pm, Melton replied, "Monday, we will proceed with termination and meet with the staff." *Id.* at p. 112.[3]

According to Lucas' declaration, that same day (Friday, May 12, 2023), Lucas asked Melton for a vacation day to see the doctor for increasing stress and anxiety.[4] It is unclear if Lucas asked to take off that day (May 12) or the following business day (May 15). It also unclear if Lucas asked for a vacation day prior to Melton telling Wagner that she would terminate Lucas on Monday. However, Lucas does not dispute that Melton intended to travel to the facility to terminate her in person on Monday, May 15, 2023.

When Melton traveled to Lucas' worksite on Monday, Lucas was absent from work. According to Wagner's declaration, "Allegiance decided to wait for Ms. Lucas to return to work

---

[2] Many of the emails between Wagner and Melton continued to copy Herzog, Morris, Cochran, and Lambert. Some emails also included Sara Wells and Karen Stem, other corporate employees. In his declaration, Wagner contends that he, Melton, Tiffany Harmon (CEO), and Jason Reed (President of Psychiatric Services) collectively decided to terminate Lucas. The Court additionally notes that both Harmon and Herzog are referred to as CEO. It is unclear if they are co-CEOs or CEOs of different facilities. In any event, when Lucas refers to a CEO in her deposition, she is referring to Herzog.

[3] Allegiance provided letters to each staff member dated May 15, 2023 apologizing for the payroll errors, informing them how much backpay they were owed, and informing them that they would be paid for the missing time on May 26, 2023.

[4] Lucas' declaration provides no information regarding whether Melton responded to her May 12 request for a day off.

3

so that she could be notified of her termination in person as originally planned." [48], Ex. 2 at p. 5. Lucas was absent from work over the next week while she sought treatment for stress, anxiety, and depression.

On May 15, 2023, Lucas went to Express Care of Cleveland, LLC because she was experiencing increased stress due to the requirements of her job. The medical records from Express Care indicate that Lucas felt like she was going to have a "mental breakdown" and "request[ed] a few days off work to regroup." [48], Ex. 5 at p. 6. The medical provider at Express Care prescribed Lucas medication, authorized her to return to work on May 17, 2023 without restrictions, and instructed her to make an appointment with her primary care provider, Dr. Degail Hadley at Dynamic Wellness.

The following day (May 16, 2023), Lucas saw Shonda Williams, FNP at Dynamic Wellness. Lucas reported to Williams that she was feeling stressed at work and experiencing crying spells. She further reported that she wanted a leave from work. Under "Assessment/Plan," the medical records indicate that Williams instructed Lucas to continue her medication and referred her to counseling with an appointment scheduled on May 18, 2023. [48], Ex. 4 at p. 8. The notes also indicate that Lucas was to return to Dynamic Wellness for a follow-up appointment on May 23, 2023. Lucas received a "Return to Work/School" form wherein Williams checked "may return to work/school on: pending re-evaluation on 5/23/2023." [53], Ex. 3 at p. 6. Lucas sent that form to Melton on the same day—May 16, 2023.[5] The form contains no information regarding Lucas' health condition.

---

[5] As will be discussed more fully hereinafter, in her declaration, Lucas contends that she texted Herzog a doctor's note, though which note she sent is not entirely clear.

On May 18, 2023, Lucas saw Mallory Dill, LPC at Trio Counseling. The Trio Counseling records do not include any notes from a May 18 appointment, but Lucas testified that she went to Trio Counseling that day.

On May 23, 2023, Lucas went to Trio Counseling again. The appointment notes from that day state that "Lucas became emotional stating she needs time off from work. She has put in 15 years at a company that doesn't respect her time off. . . And [sic] email was sent to her written on my behalf requesting client have time off." [48], Ex. 6 at p. 4.

Lucas also returned to see Williams at Dynamic Wellness on May 23, 2023. The appointment notes from that day indicate that Lucas was feeling better after going to counseling. Williams also noted that Dill gave Lucas a letter requesting a leave of absence for an unknown period of time. After this appointment, Lucas was to continue taking her medications as prescribed and return for a visit on June 5, 2023 for previously-scheduled, unrelated lab work.

Separately, on May 23, 2023 at 8:43 am, Melton emailed Wagner to tell him that Lucas had not returned to work. Melton told Wagner that Lucas provided a doctor's excuse on May 16, 2023 that said she "may return to work pending re-evaluation on 05/23/2023." [48], Ex. 1 at p. 126. Melton asked Wagner how she should proceed if Lucas is "taking off work for more days from the doctor." *Id.* At 9:01 am, Wagner replied, "So she has a re-evaluation appointment today? If so, let's see what that yields and if she returns to work tomorrow proceed as previously discussed." *Id.*

Later that same day (May 23, 2023) at 12:28 pm, Lucas forwarded an email from Dill to Melton with the subject line "Leave request." *Id.* at p. 128. Dill's email states that Lucas was diagnosed with post-traumatic stress disorder. *Id.* It further states: "This is a request for leave time for Mary Ann [sic] to work with her prescriber Dr. Hadley and attend therapy to reach a level of

stability. Leave time requested is unknown at this time of when client will be ready to return back to work." *Id.* Melton then forwarded Dill's email to Wagner and said, "Please see below and advise. I have not given her any FMLA paperwork." *Id.*

On May 24, 2023, Allegiance informed Lucas of her termination via email and certified mail. The termination letter provides that Lucas was terminated for altering timecards to eliminate overtime.

Lucas thereafter filed an EEOC charge of discrimination and later suit in this Court. She alleges that Allegiance terminated her due to her age, retaliated against her for seeking FMLA leave, and interfered with her rights under the FMLA. In the present Motion [48], Allegiance seeks summary judgment as to each of Lucas' claims.

*Legal Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct.

2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

The Court will begin with Lucas' ADEA claim before turning to her FMLA claims.

## I.   ADEA Claim

The ADEA makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Where, as here, a plaintiff relies on circumstantial evidence to prove her age discrimination claim, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under that framework, Lucas must first establish a prima facie case of age discrimination by showing that: "(1) [she] was discharged; (2) [she] was qualified for the position; (3) [she] was within the protected class at the time of discharge; and (4) [she] was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age." *Dabbasi v. Motiva*

*Enterprises, L.L.C.*, 107 F.4th 500, 505 (5th Cir. 2024) (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010)).

Once a plaintiff establishes a prima facie case, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Moss*, 610 F.3d at 922 (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)). If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the provided reason is "merely pretextual." *Id.* (citing *Jackson*, 602 F. 3d at 378-79). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (quoting *Jackson*, 602 F. 3d at 378-79) (internal quotation marks omitted). Importantly, the ADEA requires a plaintiff to prove that age was the "but-for cause" of her termination. *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009).

Here, Allegiance assumes *arguendo* that Lucas can establish a prima facie case of age discrimination, and Lucas concedes that Allegiance has articulated a legitimate, non-discriminatory reason for her termination—namely, the alteration of timecards in violation of company policy. Thus, the parties chiefly dispute whether Lucas has created a question of fact as to pretext.

First, Lucas contends that shortly before her termination, CEO Vearnail Herzog made a comment during a meeting that is evidence of age-related bias. At her deposition, Lucas testified that during a leadership meeting in April or May 2023, Herzog told her that she had reached her maximum salary. *See* [48], Ex. 3 at p. 49. In her declaration provided in support of her Response [53], Lucas adds that Herzog looked directly at her when she made the comment and that Melton

(who was involved in the decision to terminate Lucas) was present at the meeting. *See* [53], Ex. 1 at p. 1.[6]

The Fifth Circuit has explained that "[i]n order for an age-related comment to be probative of discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Moss*, 610 F.3d at 929 (quoting *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)). "Remarks may serve as sufficient evidence of age discrimination if they are: 1) age related, 2) proximate in time to the employment decision, 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue." *Id.* (quoting *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 683 (5th Cir. 2001)). For example, in *Moss*, where the employer made a statement related to hiring a "more junior level" attorney, the Fifth Circuit held that the comment was not "'direct and unambiguous' or even-age related." *Id.* The court noted that the comment "could very well refer to an older individual who went to law school later in life or otherwise had less experience" and emphasized that in context, the comment was consistent with the company's need to hire an attorney to assume lower-level responsibilities after a restructuring of the legal department. *Id.*

Here, at her deposition, Lucas testified that Herzog did not reference her age when Herzog stated that she had reached maximum salary. *See* [48], Ex. 3 at p. 50. Lucas also consistently testified that Herzog had been pressuring her to cut costs. *See id.* at p. 24-25. Thus, like in *Moss*, Herzog's comment does not directly and unambiguously relate to Lucas' age and in context

---

[6] Lucas' declaration provides that Herzog made the comment during a meeting in March or April of 2022. *See* [53], Ex. 1 at p. 1. This contradicts her deposition testimony where she alleges that the comment was made in April or May of 2023. *See* [48], Ex. 3 at p. 49. The Court accepts the deposition testimony as true. *See Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (citing *Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019)) (pursuant to the sham affidavit doctrine, the Court may disregard an affidavit where it is "inherently inconsistent" with prior testimony).

appears to be consistent with Herzog's budgetary concerns. There is also no evidence that the comment was related to Lucas' termination. It is therefore not sufficient evidence of age discrimination. *See Moss*, 610 F.3d at 929.

Lucas nevertheless argues that Herzog's comment about her reaching maximum salary "suggests age animus tied to tenure." [54] at p. 9. Lucas relies on *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144 (5th Cir. 1998), arguing that the case "distinguish[es] age bias from salary-based decisions when tenure implies age." *Id.* In *Armendariz*, the ADEA plaintiff argued that his high salary or fast-approaching eligibility for retirement benefits motivated his employer's termination decision. 58 F.3d at 152. The Fifth Circuit held that "[e]ven if proven true, that would not be sufficient alone to support a finding of age discrimination because the ADEA prohibits discrimination on the basis of age, not salary or seniority." *Id.* (citations omitted). Similarly here, even if Lucas proved that she was terminated due to her high salary (which she has not proven and does not argue), this would not support a finding of age discrimination. Moreover, *Armendariz* includes no discussion tying an employee's tenure to a finding of age-related bias, and the Supreme Court has previously rejected such an argument. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'").

Allegiance additionally argues that the collective nature of the decision to terminate Lucas weighs against a finding of discrimination. *See Strong v. Uni. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 n. 2 (5th Cir. 2007) ("Uniform agreement to fire [the plaintiff] strengthens UHS's argument that poor performance and improper conduct were the reasons she was fired. In addition, collective decision-making is less susceptible to influence by an individual with a retaliatory

10

motive."). Again, Wagner's declaration alleges that he, Melton, Harmon, and Reed decided to terminate Lucas, and Lucas points to no evidence to dispute that point. *See* [48], Ex. 2 at p. 4. In response, Lucas asserts that the collective nature of the decision is irrelevant because Herzog influenced the decision (and, presumably, Lucas contends that Herzog harbored age-related bias in light of her comment). Given that Herzog's comment is not sufficient evidence of age discrimination, Lucas' argument is rejected. Moreover, aside from pointing out that Herzog is copied on emails regarding the timecard investigation, Lucas points to no evidence that Herzog influenced the termination decision.

Next, Lucas argues that Allegiance's proffered reason is pretextual because younger employees committed more serious violations and were not disciplined or terminated. To demonstrate pretext through evidence of disparate treatment, Lucas must point to employees outside of her protected class who were treated favorably in comparison with her under "nearly identical circumstances." *Turner v. Kansas City. S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (citations omitted). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* (quoting *Lee v. Kan. City. S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)); *see also Vann v. Mattress Firm, Inc.*, 626 F. App'x 522, 527 (5th Cir. 2015) (applying same standard at pretext stage of ADEA case).

With respect to comparators, in her declaration, Lucas alleges:

> I observed that other employees at Allegiance engaged in illicit conduct that did not result in termination. For example, Latisha Johnson (office manager) and Virgia Jackson (nurse, in her 70s) adjusted timecards or accrued overtime without consequence. Additionally, a younger employee brought a weapon to work and had it on his desk and was told only to store it in their vehicle. Nurses

11

> also received and consumed beer gifted by Debbie Lewis
> (marketing) and took controlled substances (downers) caught on
> camera, yet faced no termination; however, some were reassigned.
> Sharon Taylor (former HR) used a company card for personal
> expenses and repaid it without discipline. Rebecca Chunn (Nurse
> Director) was recorded at a casino while clocked in but was not
> fired.

[53], Ex. 1 at p. 5.

For starters, to the extent the allegation regarding Johnson and Jackson's adjustment of timecards is an allegation that they specifically deleted employees' overtime hours without consequence, this directly contradicts Lucas' testimony that she was unaware of employees that committed similar misconduct:

> Q.    Who is it that had similar misconduct that was treated more
>       favorably than you?
>
> A.    I don't know of similar misconducts. I know of misconducts.
>
> Q.    But nothing similar?
>
> A.    Nothing that I'm aware of that's similar to my misconduct.

[48], Ex. 3 at p. 57.

Under the sham affidavit doctrine, the Court may disregard an affidavit where it is "inherently inconsistent" with prior testimony. *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (citing *Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019)). Nevertheless, even accepting the comparator allegations of Lucas' declaration as true, the allegations do not provide Johnson's age. It is therefore not possible for this evidence to show that Johnson was treated more favorably because she was outside of Lucas' protected class. And with respect to Jackson, the declaration provides that she was in her 70s and thus in the same protected class as Lucas (over 40 years old). Like Johnson, a comparison with Jackson would not demonstrate that Lucas was treated less favorably because of her age. As to the remaining potential

comparators, Lucas points to no evidence regarding their age nor does she allege that they committed comparable violations while working under the same supervisor.

Lastly, Lucas argues that "she had been adjusting timecards for years under the oversight of Human Resources without ever receiving a reprimand, warning, or indication that this practice violated company policy," and Allegiance fired her for doing so several weeks after Herzog made the maximum salary comment, which the Court has previously rejected as evidence of age-based discrimination. The Court will nonetheless consider Lucas' apparent argument that Allegiance's proffered justification is unworthy of credence because she had adjusted timecards in the past without consequence. In support of her argument, Lucas points to her declaration that provides in pertinent part as follows:

> 6. As part of my job duties, from time to time I would adjust employee timecards when necessary. This was a normal practice among managers at Allegiance, and subordinates had full access to adjust their own time from home.
>
> 7. On one instance, I recall HR representative Velma Melton discussing overtime adjustments with me, including concerns about overtime for Rebecca Chunn, the Chief Nursing Officer. Typically, during my employment, adjustments were made when staff forgot to clock in or out, particularly drivers transporting patients between departments.
>
> 8. Prior to late April or early May 2023, these adjustments were minor and involved signing off on discrepancies, such as when drivers forgot to clock out of one department before clocking into another. I was never warned or disciplined about timecard adjustments before May 2023.
>
> 9. In late April 2023, I attended a meeting with CEO Herzog and Velma Melton where they informed me that my department within the company was operating at a loss. They instructed me to review the program I managed over a two-week period and eliminate overtime during that time as well as shuffle patients into other wings of the facility.
>
> . . .

13

> 22. During the scope of my employment, I believe I followed verbal instructions from CEO Herzog and Melton regarding timecard adjustments to manage overtime and budgets, particularly during the lost-profit initiative of 2023. No issues were raised about my adjustments until May 2023, when someone reportedly "called corporate" about overtime concerns—the first time this was flagged as a problem.

[53], Ex. 1 at p. 2, 5-6.

Crucially, while Lucas argues that she had been "adjusting" timecards for years without reprimand, Lucas at no point alleges in her declaration or her deposition that it was part of her job to *delete overtime hours*. Many of the declaration's statements are broad allegations to which Lucas testified in detail during her deposition. The Court will walk through the allegations of her declaration and testimony, beginning with the broad contention that it was her job to "adjust" employee timecards when necessary. [53], Ex. 1 at p. 2.

At her deposition, Lucas testified that it was her job to make "necessary corrections" to timecards. [48], Ex. 3 at p. 36. She went on to explain that she corrected "errors" and things that "need[] correcting," like missed punches. *Id.* at p. 35-36. She testified that if an employee worked overtime without approval, she was instructed to have an "in-service" meeting with them. *Id.* at p. 36. She confirmed that altering timecards was against company policy and at no point testified that her timecard-related responsibilities required her to delete overtime hours:

> Q.    Okay. At the very top, it says, "All the following violations are considered serious, therefore, these violations or any act which Allegiance Specialty Hospital of Greenville's sole opinion violations generally accepted standards of proper conduct will result in appropriate disciplinary action up to and including dismissal."
>
> So my understanding of that is, this is some examples of things that would be considered a pretty serious infraction; is that right?
>
> A.    Yes.

14

Q.      And that was your understanding during your employment?

A.      Yes.

Q.      Okay. What does number 5 say?

A.      "Altering or falsifying company records or reports, such as employment applications, timecards, accident, injury, or incident reports, financial statements, patient records, medical charts, etc."

Q.      Okay. So you understood from the code of conduct that altering timecards was a serious violation of Allegiant's [sic] policy, correct?

A.      Well, this is a violation. Of course, at the time, when I did it, I was not thinking of that. But yes, this is a violation of their policy.

. . .

Q.      So again, fair to say changing your employees' timecards was a pretty serious infraction of policy?

A.      Well, I'd changed it several times. I mean, it was part of my responsibilities to change time, add missed time. I mean, so it happened numerous, numerous of times.

Q.      And according to this policy, marking, punching, or tampering with another employee's timekeeping record is a written violation of the code of conduct; is that right?

A.      According to this, it is.

Q.      Okay.

A.      But if there's errors on the timecard, I mean, I'm the one that's held accountable for correcting it.

Q.      Okay. Who told you to change the timecards?

A.      What do you mean? And audit them?

Q.      Well, that might be a good point of clarification.

15

When you say "auditing them," what does that mean to you?

A.  I have to verify time and approve it.

Q.  Okay. And if you had a concern that time did not match what you thought it should or you didn't feel like you could approve it, what were you supposed to do?

A.  If I thought I could not approve it?

Q.  Right, if there was an issue with an employee's time.

A.  I would talk to them about the time, first of all, to see why it wasn't brought to my attention initially, because all overtime is supposed to be brought to my attention. Missed time or I forgot a time actually became an issue. And we had to have a meeting about how many times is the company going to allow you to forget to punch in or to clock out. . .

But it was my responsibility. I've turned in time before, you know, and was verbally reprimanded because I didn't make the necessary adjustments, you know, on the days, time, all of that. That was my responsibility.

Q.  And who verbally reprimanded you for not making adjustments?

A.  Velma [Melton], the HR director.

Q.  And what did Velma say to you?

A.  She told me that I'm supposed to approve time and check it to make sure that it's accurate and appropriate, and the days.

Q.  Okay. And then if it was not accurate or appropriate, what did Velma tell you to do?

A.  I don't know if she ever told me to do anything. I mean, that was just a reprimandation [sic] for me not doing it.

Q.  . . . Did you ever come to Velma or to your supervisor and say, I have an employee who is working overtime without my approval or who's not punching in and out, what do I do? Did you ever report that issue to your supervisors or to HR?

16

A.    Well, we've had meetings about it because it happened so frequently in my building as well as the hospital building. We were just told to have in-services with them, you know, and to let them know corporate is monitoring the time, and they have to clock in and out. It happens.

Q.    And when you would have those discussions, no one ever told you that you needed to go in and alter your employees' time records, just that you needed to counsel and discipline them if they failed to follow policy, correct?

A.    That's with the signing in and out. There were days that people had time on there that they didn't work. You know, like the weekends. We're not open on the weekends.

Q.    Did you issue those people written warning or discipline them?

A.    Well, I talked to them. Like, for instance, Velma took a time and put it on weekend, you know, because they had worked at the hospital. . .

Q.    . . . Was it not appropriate for you to discipline your employees if you they're [sic] not following the timekeeping policies?

A.    Sure. The discipline was to have an in-service with them.

Q.    And to change their timecards?

A.    Well, if it's wrong, if it needs correcting. If they missed the punch, then I would have to—some of them I would have to call them and say, Hey, you didn't punch in. What time did you clock in today?

Q.    As far as altering the amount of time or when they worked, that's not something you were ever instructed to do; is that right?

A.    That was one of my responsibilities.

Q.    To change peoples' time records?

A.    To make the necessary corrections.

Q.    Let's go back to the employee handbook that you've got. . .

17

. . .

Q.    . . . Do you see where it says, "It is the employee's responsibility to report to the supervisor if he or she fails to punch in and out on the time clock"?

A.    Yes.

Q.    Okay. I think that's what you've testified earlier, that if there were missed punches, you were supposed to fix that; is that correct?

A.    Yes.

Q.    Okay. Do you see where it says, "Using, changing or filling out tampering in any way with another employee's time record is cause for discharge"?

A.    Yes.

. . .

Q.    So if you have employees who are putting in time where they're not working, they're subject to discipline up to discharge, correct?

A.    Yes.

. . .

Q.    All right. There's not anything in this policy that says that a supervisor should reduce time to prevent overtime?

A.    Of course not.

*Id.* at p. 35-37.

Again, while Lucas asserts that Allegiance's reasoning is pretextual because she had been adjusting timecards for years without consequence, Lucas' deposition testimony does not indicate that deleting overtime hours was part of her job.

Next is the declaration's allegation that Melton "discuss[ed] overtime adjustments with [Lucas], including concerns about overtime for Rebecca Chunn, the Chief Nursing Officer." [53], Ex. 1 at p. 2. At her deposition, Lucas initially testified that even though it was against company policy to alter timecards, "it happen[ed] all the time," and Melton told her that it happened. [48], Ex. 3 at p. 47. Lucas could provide no specific examples of others altering timecards and later testified that she did not know if Melton ever specifically told her that another employee had altered someone's timecard. *Id.* at p. 48. With respect to Chunn, Lucas testified that Melton told her Chunn showed favoritism to one employee over another when approving overtime and that Melton once required Chunn to re-review timecards for a reason that Lucas did not know. *See id.* at p. 47-48. Again, when the declaration's broad contention about "overtime adjustments" is viewed in conjunction with Lucas' specific deposition testimony, neither demonstrate that Lucas (or others) regularly deleted overtime hours as part of her job.

The next paragraph of Lucas' declaration alleges that "[p]rior to late April or early May 2023, these adjustments were minor and involved signing off on discrepancies[.]" [53], Ex. 1 at p. 2. This statement that Lucas' "adjustments" involved signing off on discrepancies until around the time she was terminated undercuts her argument that Lucas had been deleting overtime without reprimand for 15 years.

Next, Lucas' declaration alleges that she was instructed in April 2023 to "eliminate overtime." *Id.* at p. 2. The declaration further alleges that Lucas "followed verbal instructions from CEO Herzog and Melton regarding timecard adjustments to manage overtime." *Id.* at p. 5. With respect to a verbal instruction from Melton, as quoted above, Lucas testified at her deposition that she was unsure if Melton ever gave her any specific instruction regarding how to handle an inaccurate timecard. *See* [48], Ex. 3 at p. 35-36. She also testified that she was instructed during

meetings to have "in-services" with employees who worked overtime without approval. *Id.* Thus, to the extent that Lucas' declaration is a contention that she received an instruction from Melton to delete overtime hours an employee had already worked, it is "inherently inconsistent" with her deposition testimony and the Court disregards it. *Seigler*, 30 F.4th at 477 (citing *Winzer*, 916 F.3d at 472).

Moreover, at her deposition, Lucas testified about cost-cutting directives from corporate, including cutting half of her staff, combining facilities, placing more patients in each room, and eliminating afternoon therapy sessions. *See* [48], Ex. 3 at p. 24-26. She testified that as part of her efforts to "watch the budget," she discussed with her staff that "overtime had to be approved, and all that. . . the CEO was telling [her] had to take place." *Id.* at p. 25-26.   She explained that toward the end of her employment she was "more adamant" that overtime needed to be approved and that she needed to inform the CEO about overtime, for example, if one of the facility's drivers was delayed and ended up working over 40 hours. *Id.* at p. 25. She testified that telling her staff about overtime preapproval was the only thing she could recall telling them about overtime. *Id.* at p. 26. In other words, Lucas testified extensively about corporate directives and the need to preapprove overtime, and she never testified that she received an instruction to "eliminate overtime" by deleting overtime hours that employees had already worked. When read in conjunction with her deposition testimony, the declaration's allegation regarding an instruction to "eliminate overtime" appears to be a contention that Lucas was instructed not to preapprove overtime hours. To the extent that it is a contention that she received an instruction to delete overtime hours already worked, it is "inherently inconsistent" with her deposition testimony regarding the many corporate directives she received, including the need to preapprove overtime, and the Court disregards it. *Seigler*, 30 F.4th at 477 (citing *Winzer*, 916 F.3d at 472).

Notably, even if the Court accepted as true Lucas' argument that she had been deleting overtime for years and that Herzog and Melton instructed her to "manage overtime" by deleting it from an employee's timecard, Lucas' age discrimination fails because she has not tied her termination to her age in any way. As noted above, Lucas must prove that age was the but-for cause of her termination. *See Gross*, 557 U.S. at 180, 129 S. Ct. 2343. The Fifth Circuit has explained that there may be cases where "an employee presents evidence that would allow a jury to conclude that the employer's proffered justification for an adverse action is false, but that does not necessarily permit a rational inference that the real reason was discrimination." *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (holding in an ADEA case that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").

Lucas testified that Herzog's comment about her salary was the only thing she could think of that tied her age to her termination, and the Court has determined that the comment is not sufficient evidence of age discrimination. *See* [48], Ex. 3 at p. 50. She testified that there were no comments about her age during her evaluations or in the workplace generally. *Id.* She further testified that several of the individuals on the email chain regarding her termination may not have known her age because they were new hires. *Id.* at p. 59. Thus, even if Lucas' declaration casts doubt on Allegiance's proffered justification by suggesting that deleting overtime was a normal part of her job, Lucas' claim fails because she points to no evidence from which a jury could infer that age was the but-for cause of her termination.

Summary judgment in Allegiance's favor on the ADEA claim is warranted and hereby GRANTED.

## II. FMLA Retaliation Claim

Next, Lucas asserts that she was terminated for requesting FMLA leave.

The FMLA permits an employee to take up to 12 weeks of medical leave for their own serious medical condition or for the care of a family member with a serious medical condition. *See* 29 U.S.C. § 2612(a)(1). The FMLA prohibits retaliation against those who exercise their FMLA rights. *See id. at* § 2615(a)(2); *Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 580 (5th Cir. 2006). Like the claim above, "[r]etaliation claims under the FMLA are analyzed under the *McDonnell Douglas* burden-shifting framework." *Houston v. Tex. Dept. of Agric.*, 17 F.4th 576, 582 (5th Cir. 2021) (citing *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.2d 702, 705 (5th Cir. 2016)). "Under that framework, the plaintiff must first establish a prima facie retaliation case by showing three elements: '1) [she] was protected under the FMLA, 2) [she] suffered an adverse employment action; and 3) [she] was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because [she] sought protection under the FMLA.'" *Id.* (quoting *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 790 (5th Cir. 2017)). "If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to 'articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (quoting *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005)). "In the third step. . . the burden shifts back to the plaintiff to 'show by preponderance of the evidence' that the defendant's reason is a pretext for retaliation." *Id.* (quoting *Richardson*, 434 F.3d at 333). The employee "does not have to show that the protected activity is the only cause of her termination," however she is "required

to show that the protected activity and adverse employment action are not completely unrelated." *Mauder*, 446 F.3d at 583.

A.    *Prima Facie Case*

First, to demonstrate that she was protected under the FMLA, Lucas must show that she provided Allegiance notice of her intent to request FMLA leave for a serious health condition. *See Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 913 (5th Cir. 2010) (affirming dismissal of FMLA retaliation claim where plaintiff failed to demonstrate that he engaged in protected activity by providing notice of intent to take FMLA leave); *Sosa v. Coastal Corp.*, 55 F. App'x 716, at *2 (5th Cir. 2002) ("To satisfy the first element, [plaintiff] must should that she suffered from a serious health condition that made her unable to perform the functions of her position.") (citing 29 U.S.C. § 2612(a)(1)); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 975 (5th Cir. 1998) (discussing adequacy of notice and seriousness of employee's condition in determining whether employee's leave request qualified for FMLA protection).

Allegiance asserts that Lucas was not protected under the FMLA because she never provided notice of her intent to take FMLA leave, and even if she did, she was not eligible for leave because she did not suffer from a serious health condition. The Court will address the two issues in turn.

i.    *Notice*

"While the employee has a right to take leave under the FMLA, the employee must give his employer notice of his intention to take leave in order to be entitled to it." *Acker v. General Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (citing 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.303). "When giving notice, an employee need not 'expressly invoke' the FMLA." *Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1002 (5th Cir. 2024) (quoting *Manuel v. Westlake*

*Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995)). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Id.* (quoting *Manuel*, 66 F.3d at 764). If the employee provides "such information about her condition as will make it evident that the FMLA is implicated. . . the burden will shift to the employer to make further inquiry as to whether the leave qualifies for FMLA protection." *Towns v. Northeast Miss. Elec. Power Ass'n*, 478 F. App'x 244, 247 (5th Cir. 2012) (citing *Satterfield*, 135 F.3d at 981-82). "But 'while an employer's duty to inquire may be predicated on statements made by the employee, the employer is not required to be clairvoyant.'" *Cerda*, 95 F.4th at 1002 (quoting *Satterfield*, 135 F. 3d at 980) (internal alterations omitted). "Additionally, employers may 'condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances[.]'" *Id.* (quoting *Acker*, 853 F.3d at 789).

First, Lucas argues that Allegiance was on notice of her need to take leave based on her treatment with cardiologist Dr. John Herzog. In her declaration, Lucas alleges that she saw Dr. Herzog between December 2022 and May 15, 2023 for heart issues, anxiety, and stress, and he asked her about stress at work. [53], Ex. 1 at p. 3. Lucas alleges that her treatment with Dr. Herzog placed Allegiance on notice of her need for leave because Dr. Herzog was the husband of CEO Herzog and on the hospital's Board of Directors. First, the Court disregards the declaration's statement that Lucas saw Dr. Herzog for stress and anxiety between December 2022 and May 2023 because it directly contradicts her deposition testimony that she did not report issues with anxiety to her healthcare providers until May 15, 2023. *See* [48], Ex. 3 at p. 40; *Seigler*, 30 F.4th at 477 (citing *Winzer*, 916 F.3d at 472). But even setting aside the lack of clarity regarding Lucas' treatment with Dr. Herzog, Lucas points to no evidence that Dr. Herzog was responsible for

handling FMLA leave requests or that he told a supervisor with that responsibility that Lucas had a medical condition that may require FMLA leave. *See Towns*, 478 F. App'x at 247 (finding question of fact as to whether employee adequately requested leave where there was factual dispute as to which individual had responsibility for handling leave requests). Lucas has not even pointed to evidence that Dr. Herzog would have known that she intended to request FMLA leave. In her declaration, she specifically contends that "[Dr. Herzog] did not recommend medical leave" but would have been aware of her stress because he was on the Board and the husband of the CEO. [53], Ex. 1 at p. 3. Without more, Lucas' treatment with Dr. Herzog did not provide Allegiance with notice that she intended to request FMLA leave.

Next, Lucas asserts that her conversations with Melton provided Allegiance with sufficient notice. In her declaration, Lucas contends that she "casually discussed" her stress and anxiety with Melton from January through May 2023. *Id.* at p. 4. She further contends that "on May 12, 2023, I requested a vacation day from Velma Melton, stating that I needed to see a doctor for my increasing symptoms." *Id.* at p. 4. First, a "casual discussion" about work-related stress would not have alerted Melton to Lucas' need for FMLA leave. *See Wilson*, 405 F. App'x at 913 (holding that employee's comment that he "might" need leave after the birth of his child was not sufficient notice that he needed FMLA leave). Second, Lucas' request to take a vacation day—a *single* day, not an extended absence—to see a doctor would not have alerted Melton to Lucas' need for leave. *See* 29 C.F.R. § 825.303(b) ("Calling in sick without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act.").

Lucas additionally argues that a text exchange with CEO Herzog placed Allegiance on notice of her intent to take FMLA leave. In her declaration, Lucas asserts: "Between May 12 and May 16, I visited Dr. Hadley, who placed me on sick leave and referred me to a therapist. In the

25

report, it states that I needed to be off work and that I could return on the 17th without restrictions. I then texted CEO Herzog that I could not come into work due to this doctor's visit, sending her a photo of the urgent care statement." [53], Ex. 1 at p. 4. As an initial matter, Lucas' declaration appears to be confusing her May 15 Express Care appointment (which included a report that said she may return to work on May 17th) and her May 16 appointment with Williams at Dynamic Wellness (where she usually saw Dr. Hadley). At her deposition, Lucas testified extensively about her medical appointments. She testified that she first sought treatment for work-related anxiety on Monday, May 15, 2023 at Express Care. *See* [48], Ex. 3 at p. 40. She testified that she went to Dynamic Wellness the following day and received a referral to therapy.[7]

Again, the next line of Lucas' declaration states: "I then texted CEO Herzog that I could not come in to work due to this doctor's visit, sending her a photo of the *urgent care* statement. Herzog confirmed via text that I could take some time off, though no formal FMLA process was initiated." [53], Ex. 1 at p. 4. If Lucas sent the urgent care record to Herzog, Lucas would have sent the May 15 record saying that she could return to work on May 17. If this is a contention Lucas sent Herzog the May 16 doctor's excuse she received from Williams, Lucas would have sent Herzog a note saying that she could return to work "pending re-evaluation on 5/23/23." [53],

---

[7] To be clear, the Court is not disregarding Lucas' declaration but is instead looking to her deposition testimony for further explanation. As explained above, under the sham affidavit doctrine, the Court may disregard an affidavit where it is "inherently inconsistent" with prior testimony. *Seigler*, 30 F.4th at 477 (citing *Winzer*, 916 F.3d at 472). "An affidavit that 'supplements rather than contradicts prior deposition testimony' falls outside the doctrine's ambit." *Id.* (quoting *Winzer*, 916 F.3d at 472). Here, Lucas' deposition, which provides specific appointment dates, supplements her declaration, which provides a date range within which her first appointment occurred. The declaration appears to merge medical records by providing Dr. Hadley's name in what otherwise appears to be a description of the Express Care report. The Court does not view this as so "inherently inconsistent" as to "constitute an obvious sham." *Id.* (quoting *Clark v. Resistoflex Co., A Div. of Unidynamics Corp.*, 854 F.2d 762, 767 (5th Cir. 1988)). Because "the testimony can be reconciled," the Court simply looks to Lucas' deposition for specifics as to the appointment dates and notes. *Id.* In any event, as explained below, Lucas' text to Herzog did not provide FMLA notice regardless of which doctor's note she provided.

Ex. 3 at p. 6. Neither record would have provided Allegiance with notice that Lucas needed FMLA leave for a serious health condition because they both indicate that Lucas was able to return to work. And Lucas herself admits that no formal FMLA process was initiated when she texted Herzog.

Lastly, Lucas argues that her May 23, 2023 email to Melton placed Allegiance on notice of her need for FMLA leave. On May 23, 2023, Lucas forwarded Melton an email from her counselor, Mallory Dill, which stated: "This is a request for leave time for Mary Ann [sic] to work with her prescriber Dr. Hadley and attend therapy to reach a level of stability. Leave time requested is unknown at this time of when client will be ready to return back to work." [48], Ex. 1 at p. 128. Allegiance argues that this email did not constitute notice because it included no information relating to Lucas' condition or anticipated duration of leave. *See* 29 C.F.R. § 825.303(b) ("Content of notice. . . Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job. . .and the anticipated duration of the absence, if known."). Allegiance further argues that this was not sufficient notice because Lucas did not comply with company procedure to request leave. *See id.* § 825.303(c) (requiring compliance with employer's customary notice requirements when the need for leave is not foreseeable, "absent unusual circumstances"). As the language of these regulations demonstrates, the adequacy of an employee's notice "is dependent on the facts and circumstances of each case." *Towns*, 478 F. App'x at 247 (citing *Manuel*, 66 F.3d at 764). In light of the fact that Melton forwarded the email to Wagner and indicated that she had not sent Lucas FMLA paperwork, the May 23 email may have apprised Melton of the need to inquire further as to whether the leave would qualify for FMLA protection. *See Satterfield*, 135 F.3d at 982.

27

Notwithstanding the insufficiency of Lucas' evidence as to notice prior to May 23, 2023, Lucas has created a question of fact as to whether the May 23 email she forwarded from Dill to Melton placed Allegiance on notice of her intent to take FMLA leave.

### ii. *Serious Health Condition*

To establish that she was protected by the FMLA, Lucas must additionally prove that she suffered from a "serious health condition" that made her unable to perform the functions of her job. 29 U.S.C. § 2612(a)(1)(D). The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care. . . or (B) continuing treatment by a health care provider." *Id.* at § 2611(11). Lucas contends that she had a serious health condition that required continuing treatment.

The FMLA regulations provide that a serious health condition involving continuing treatment by a health care provider includes any one or more of the following: (a) "a period of incapacity of more than three consecutive, full calendar days" that also involves treatment two or more times by a health care provider; (b) incapacity due to pregnancy or prenatal care; or (c) "[a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(a), (b), (c). Additionally relevant here, the regulations define "incapacity" as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.* at § 825.113(b). The second scenario—incapacity due to pregnancy—is not at issue here.

First, Lucas does not point to evidence showing that she "was incapacitated for more than three consecutive, full calendar days." 29 C.F.R. § 825.115(a). Lucas testified that she first sought treatment for the work-related stress and anxiety for which she sought leave on Monday, May 15, 2023 at Express Care. *See* [48], Ex. 3 at p. 40. The May 15, 2023 medical record indicates that

28

Lucas could return to work on May 17, 2023, and Lucas confirmed that at her deposition. *See id.* at p. 41; [48], Ex. 5 at p. 7. Thus, on May 15, 2023, Lucas was not unable to work for "more than three consecutive, full calendar days." 29 C.F.R. § 825.115(a).

Lucas went to Dynamic Wellness the following day—May 16, 2023. There, she received a "Return to Work/School" form where Williams checked "[m]ay return to work/school on:" and wrote "pending re-evaluation on 5/23/2023." [53], Ex. 3 at p. 6. This indicates that Lucas was able to return to work on May 16 and would be re-evaluated on May 23.

The Court notes that at her deposition, Lucas testified that she understood Williams' note to mean that she could not return to work until after she saw the therapist at Trio Counseling and returned to Dynamic Wellness on May 23, 2023. *See* [48], Ex. 3 at p. 42-43. Lucas did not dispute the validity or content of Williams' note. Notably, Williams did *not* select the "may *not* return to work" box and write in "pending re-evaluation on 5/23/2023." [53], Ex. 3 at p. 6; *cf. Hayes v. Cigna Health & Life Ins. Co.*, 2019 WL 6125318, at *4 (W.D. La. Sept. 17, 2019) (doctor's report indicated that plaintiff "should remain *off* work pending the cervical epidural steroid injection") (emphasis added). Thus, while Lucas may have interpreted the note differently, the note plainly indicates that she was able to return to work on May 16 until she was re-evaluated. *See, e.g., Towns*, 478 F. App'x at 246 (doctor "released [plaintiff] to full duty pending neurologic exam" and neurologist then took plaintiff off of work following exam).

The next medical records are from May 23, 2023. On that day, Lucas saw Williams at Dynamic Wellness and Dill at Trio Counseling. The Dynamic Wellness records indicate that Lucas "report[ed] depression, sleep disturbances, and anxiety. . . symptoms have improved since her last visit." [48], Ex. 4 at p. 10. Again, at Lucas' previous visit to Dynamic Wellness, Williams' note stated that Lucas could return to work pending re-evaluation on May 23, 2023. *See* [53], Ex. 3 at

p. 6. The May 23 re-evaluation notes then indicate Lucas' symptoms had improved. *See* [48], Ex. 4 at p. 10. Therefore, these records do not indicate that Lucas was unable to perform the functions of her job on May 23, 2023.

On the same day, Dill sent an email indicating that Lucas was diagnosed with post-traumatic stress disorder ("PTSD") and stating: "This is a request for leave time for Mary Ann [sic] to work with her prescriber Dr. Hadley and attend therapy to reach a level of stability. Leave time requested is unknown at this time of when client will be ready to return back to work." [48], Ex. 1 at p. 128. Dill's notes from Lucas' May 23 appointment state, in pertinent part:

> Client was on time and well groomed. She discussed thoughts and feelings about life circumstances. She became emotional stating she needs time off from work. She has put in 15 years at a company that doesn't respect her time off. Client is making minimal progress towards objectives. Client was oriented 3x. And [sic] email was sent to her written on my behalf requesting client have time off. Treatment plan was discussed.

[48], Ex. 6 at p. 4.

Neither Dill's notes nor her email provide any medical information indicating that Lucas was experiencing symptoms that would impair her ability to perform her job or other regular daily activities. *See* 29 C.F.R. § 825.113(b)

Moreover, Lucas has produced no evidence that she was incapacitated from May 17-May 22, 2023—the days between her doctor's appointments where she continued to be absent from work. *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 335 (5th Cir. 1997) (holding that plaintiff's condition did not rise to the level of "serious health condition" where there was no evidence that she was actually incapacitated during her absence from work). Again, Williams' note indicated that Lucas could return to work on May 16, 2023. [53], Ex. 3 at p. 6. And notably, at her deposition, Lucas testified that the facility continued to contact her while she was absent. *See* [48],

Ex. 3 at p. 43-44. She testified that "[i]t was just like [she] wasn't off." *Id.* She did not testify that she was unable to handle the work matters about which she was contacted during that time.

Because Lucas has not demonstrated that she was incapacitated for "more than three consecutive, full calendar days," she has not shown that she suffered from a serious health condition involving continuing treatment as defined by 29 C.F.R. § 825.115(a).

Next, Lucas appears to argue that she had a "chronic serious health condition" under 29 C.F.R. § 825.115(c). Lucas argues that "her December 2022 cardiac symptoms with a 40% ejection fraction, May 15 anxiety diagnosis with medications, May 16 stress and depression, and May 23 PTSD diagnosis show a chronic condition requiring ongoing treatment[.]" [54] at p. 19. A chronic serious health condition is defined as one which "requires periodic visits for treatment by a health care provider ... [c]ontinues over an extended period of time (including recurring episodes of a single underlying condition); and [m]ay cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.115(c).

Crucially, Lucas points to no evidence that the anxiety and/or PTSD for which she sought leave in May 2023 was itself a chronic serious health condition. She additionally points to no evidence that her heart condition was a chronic serious health condition or that her leave request was based on her heart condition.

First, regarding her diagnoses of anxiety and PTSD, Lucas points to no evidence that these conditions continued over an extended period of time or caused episodic or continuing periods of incapacity. The May 23, 2023; June 9, 2023; September 5, 2023; and February 1, 2024 medical records from Dynamic Wellness indicate that Lucas' symptoms were improving. *See* [48], Ex. 4 at p. 9-20. The September 5, 2023 and February 1, 2024 records specifically provide that Lucas' "symptoms have improved since being let go from her job." *Id.* at p. 16, 19. At the February 1,

2024 appointment, Lucas reported no anxiety or depression. *Id.* at p. 19. Lucas additionally stopped seeing Dill at Trio Counseling after she began a new job in June 2023. *Id.* at p. 16. At her deposition, Lucas agreed that she sought medical care for "general job stress" and that the investigation was "an additional stressor that pushed [her] to seek medical care." *See* [48], Ex. 3 at p. 57. Overall, Lucas' medical records and testimony indicate that her psychiatric symptoms were related to her stress at work during a specific period of time and not due to a chronic condition that continued over an extended period of time, causing episodic or continuing periods of incapacity.

Second, with respect to her heart condition, Lucas has pointed to no evidence that it caused episodic or continuing periods of incapacity. Moreover, Lucas appears to be arguing that her anxiety was related to her heart condition in some way. She alleges that her anxiety and PTSD were a continuation of her heart condition, which she argues is a chronic serious health condition. As such, Lucas presumably argues that she sought leave for anxiety so she necessarily was seeking leave for her chronic heart condition. This argument fails for two reasons. One, as stated, Lucas points to no evidence to support the argument that her heart condition was a chronic serious health condition. Two, even if Lucas demonstrated that her heart condition was a chronic serious health condition, there is no evidence linking the anxiety and/or PTSD *for which she sought leave* and her heart condition. *See Satterfield*, 135 F.3d at 975 ("In determining whether an employee's leave request qualifies for FMLA protection, the employer must assess whether the request is *based on* a 'serious health condition.'") (emphasis added).

On January 25, 2022, Lucas went to Express Care "with complaints of fast heart rate and elevated blood pressure after eating a snack with a lot of sodium in it." [53], Ex. 2 at p. 39. She did not report heart palpitations on that date. *Id.* The medical records reflect that she had heart

palpitations when she returned to Express Care for lab work a few weeks later on February 11, 2022. *Id.* at p. 41. These Express Care records indicate that lab work was performed, but they do not show any particular diagnosis or referral. At a March 23, 2022 appointment at Dynamic Wellness, Lucas told Dr. Hadley she had recently been to Express Care for high blood pressure and "everything checked out fine." [53], Ex. 2 at p. 3.

On December 20, 2022, Lucas reported to Dr. Hadley that she was experiencing heart palpitations, muscle twitching in her upper chest area, tingling and burning in her arm, and low energy levels. *See* [53], Ex. 2 at p. 5. The Dynamic Wellness records indicate that she had seen Dr. Herzog in the past and had an echocardiogram that showed a 40% injection fraction, but she received no further treatment or testing. *Id.* At this appointment, Lucas requested a referral to a different cardiologist, and the request was granted. *Id.* at p. 6-7. Lucas reported no anxiety or depression at this appointment. *Id.* at p. 6.

Lucas returned to Dynamic Wellness on March 1, 2023 for a check-up. She did not report heart palpitations, chest pain, shortness of breath, or other new issues that day "but she did have an episode of pleurisy," which is inflammation of the membrane surrounding the lungs. *See* [53], Ex. 2 at p. 9; *Pleurisy*, *pleura*, Steadmens Medical Dictionary 697060, 696830 (2014). The records contain no information regarding whether she had seen Dr. Herzog or the new cardiologist after her December 2022 appointment. Lucas reported no anxiety or depression on this date. *See* [53], Ex. 2 at p. 10.

The next medical record is from May 15, 2023. At her deposition, Lucas testified that this was the first time she reported anxiety to her heath care providers:

Q.     . . . And so, then, this would be Monday the 15th.

A.     Okay. I went to the doctor on Monday.

> Q.      Okay. And the triage notes, it says, "Patient presents today with complaints of anxiety and states 'she feels like she is about to have a mental breakdown.' She works at mental health as director. Patient reports increased stress due to requirements of job. . .
>
> So, Ms. Lucas, you first presented to your health care providers that you were having job-related anxiety one week after you were notified that the company was investigating your alteration of timecards.
>
> A.      Okay.
>
> Q.      Is that right?
>
> A.      That's documented, yes, ma'am.
>
> . . .
>
> Q.      Previously you had not reported any issues with anxiety to your health care—
>
> A.      Well, I didn't have any at the time.

[48], Ex. 3 at p. 40.

Lucas went on to testify that Dr. Herzog asked about her stress at work but did not tell her that her stress caused her cardiac symptoms. *See* [48], Ex. 3 at p. 41.[8]

Again, the medical records from May 15, 2023 forward (the appointments where Lucas reported anxiety) include no complaints of chest pain, palpitations, or other cardiac symptoms. *See* [48], Ex. 4 at p. 2-20; [48], Ex. 5 at p. 2-10. Lucas has pointed to no evidence that the anxiety she reported in May 2023 exacerbated or otherwise related to a previously-diagnosed heart condition. Overall, Lucas has failed to prove that her anxiety and/or PTSD or her heart condition was a

---

[8] In her declaration, Lucas contends that she saw Dr. Herzog for heart issues, *anxiety, and stress* between December 2022 and May 15, 2023. *See* [53], Ex. 1 at p. 3. As noted above, this directly contradicts her testimony that she did not report anxiety until May 15, 2023, and the Court accordingly disregards this part of her declaration.

chronic serious health condition. And even if Lucas proved that her heart condition was a chronic serious health condition, she points to no evidence to demonstrate that she requested FMLA leave based on that condition. *See Satterfield*, 135 F.3d at 975 ("In determining whether an employee's leave request qualifies for FMLA protection, the employer must assess whether the request is *based on* a 'serious health condition.'") (emphasis added).

Lucas' FMLA retaliation claim fails because she cannot satisfy the first element of her prima facie case—that she was protected under the FMLA. The Court will nevertheless consider the third prima facie element.

### iii. Causation

Next, to establish a prima facie case, Lucas must point to evidence that "[she] was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because [she] sought protection under the FMLA." *Houston*, 17 F.4th at 582.

First, Lucas argues that Allegiance's failure to follow its own progressive discipline policy is evidence of retaliation. Lucas points to no evidence that Allegiance deviated from its own policy. The employee Code of Conduct provides that "[u]sing, changing, filling out or tampering in any way with another employee's time record is cause for discharge." [48], Ex. 1 at p. 24. At her deposition, Lucas confirmed that altering timecards was considered a serious violation. *See* [48], Ex. 3 at p. 35. She testified that she "was not thinking of that" at the time and that it was her responsibility to correct "errors" on timecards. *Id.* Importantly, as discussed above, Lucas has pointed to no evidence that it was part of her job to delete employee's overtime hours or that Allegiance failed to follow its own disciplinary policies when terminating her.

Next, Lucas argues that the temporal proximity between her May 23, 2023 email requesting leave and her May 24, 2024 termination demonstrates a causal connection. *See Besser v. Tex. Gen.*

*Land Office*, 834 F. App'x 876, 884 (5th Cir. 2020) ("very close" temporal proximity may establish causation at prima facie stage) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. D 509 (2001)). Allegiance asserts that Lucas cannot demonstrate a causal connection because it made the decision to terminate Lucas on May 12, 2023, *before* she was absent from work to seek medical care and *before* she provided any alleged notice of an intent to take FMLA leave. Lucas responds that the termination decision remained "fluid" after May 12, 2023. The Court therefore turns to the evidence regarding the date of the termination decision.

As discussed above, Melton received the complaint regarding timecards on May 8, 2023, and on the same day, she notified Lucas that the matter was being investigated. *See* [48], Ex. 1 at p. 36-37. Wagner recommended terminating Lucas on Thursday, May 11, 2023. *See* [48], Ex. 1 at p. 111. On Friday, May 12, 2023, Melton responded that she would travel to the facility on Monday, May 15, 2023 to "proceed with termination." *Id.* at. p. 112. In his declaration, Wagner explained that when Melton arrived at the facility on May 15 and Lucas was absent, "Allegiance decided to wait for Ms. Lucas to return to work so that she could be notified of her termination in person as originally planned." [48], Ex. 2 at p. 5.

In the facts section of her Response Memorandum [54], Lucas does not dispute this series of events, alleging that "[o]n May 12, Melton planned to notify Plaintiff in person on May 15. Plaintiff was absent on May 15 due to health issues, delaying *notification* until May 24." [54] at p. 4 (internal citations omitted) (emphasis added).[9]

---

[9] Lucas additionally points to the fact that Allegiance notified employees of the backpay they were owed on May 15, 2023 but did not notify Lucas of her termination until May 24, 2023 as evidence of retaliatory intent. Again, Lucas admits in her brief that Melton intended to terminate her on May 15 when she traveled to the facility and also met with the employees. *See* [54] at p. 4. Moreover, as discussed herein, Lucas points to no evidence that the decision was not finalized on May 12, 2023.

Lucas nevertheless argues that the Wagner's May 23 email to Melton indicated that the termination decision "remained fluid, not final as of May 12." *Id.* at p. 9. As described above, on May 23, 2023 at 8:43 am, Melton emailed Wagner to tell him that Lucas had not returned to work. Melton told Wagner that Lucas provided a doctor's excuse on May 16, 2023 that said she "may return to work pending re-evaluation on 05/23/2023." [48], Ex. 1 at p. 126. Melton asked Wagner how she should proceed if Lucas continues to take off work, and at 9:01 am, Wagner replied, "So she has a re-evaluation appointment today? If so, let's see what that yields and if she returns to work tomorrow proceed as previously discussed." *Id.* The email clearly demonstrates that Wagner intended to see if Lucas returned to work the next day and to terminate her in person if she did, *as previously discussed*. The email does not indicate that Allegiance was reconsidering or still determining whether to terminate Lucas. Again, as Lucas herself describes in her brief, the emails indicate that the termination decision was made on May 12 and the *notification* of the decision was delayed. *See* [54] at p. 4.[10]

As discussed above, the only communication that may have sufficed as FMLA notice was Lucas' May 23, 2023 leave request email. As such, Lucas cannot demonstrate a causal connection between the termination decision that occurred on May 12, 2023 and the FMLA notice that occurred more than a week later on May 23, 2023. *See Robinson v. Jackson State Univ.*, 714 F. App'x 354, 360 (5th Cir. 2017) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated

---

[10] Lucas also argues that Wagner's "let's see what that yields" statement indicated that the termination decision was "contingent on [Lucas'] health status." [54] at p. 15. The Court declines to make this inferential leap. *See Mason v. Lafayette City-Parish Consol. Gov.*, 806 F.3d 268, 281 (5th Cir. 2015) ("On summary judgment, we must make 'justifiable' inferences in the nonmovant's favor.") (citation omitted). Lucas has pointed to no evidence that Wagner had any information about Lucas' health, aside from Melton's email informing him that Lucas had an appointment on May 23, 2023.

against the employee based on that conduct.") (quoting *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999)). Lucas' arguments as to temporal proximity fail for this reason as well. *See Davis v. Dallas Ind. Sch. Dist.*, 448 F. App'x 485, 493-94 (5th Cir. 2011) (rejecting temporal proximity argument and finding that plaintiff could not demonstrate causal connection where termination decision was made before protected activity occurred, even though notification was delayed until after protected activity).

The Court additionally finds the Fifth Circuit's 2006 decision in *Mauder* instructive. 446 F.3d 574. There, the plaintiff was placed on a one-month corrective action plan on September 12, 2002. *Id.* at 578. On September 25, October 1, and October 8, 2002, he received notices that he was not improving in the areas identified in the plan. *Id.* On October 4, 2002, he requested FMLA leave. *Id.* He was terminated one week later on October 11, 2002, the final day of the corrective action plan. *Id.* The termination occurred eight days before he was required to file his completed FMLA leave application. *Id.* As such, the plaintiff argued that temporal proximity between his termination and his deadline to apply for FMLA leave was evidence of retaliatory motive. *Id.* at 584. The Fifth Circuit rejected his argument, relying on *Clark County School District v. Breeden*, 532 U.S. 268, 121 S. Ct. 1508.

In *Clark County*, the plaintiff alleged that she was transferred to a different position in retaliation for filing a Title VII action. 532 U.S. at 271, 121 S. Ct. 1508. The plaintiff filed her lawsuit on April 1, 1997, and on April 10, 1997, the plaintiff's supervisor mentioned to the president of the teacher's union to which the plaintiff belonged that she was considering transferring the plaintiff. *Id.* at 271-72, 121 S. Ct. 1508. The job transfer occurred in May. *Id.* at 272, 121 S. Ct. 1508. The plaintiff argued that temporal proximity showed a causal connection. The evidence showed that the supervisor was not aware of or served with the lawsuit until April

11, 1997, after she made the remark regarding transferring the plaintiff. *Id.*, 121 S. Ct. 1508. The Supreme Court therefore agreed with the district court that the plaintiff could not show a causal connection and held that "because the supervisor was contemplating the transfer before she learned of the suit, the supervisor was not required to suspend the transfer proceedings just because the employee filed the lawsuit." *Mauder*, 446 F.3d at 584 (citing *Clark Cnty.*, 571 U.S. at 273-43, 121 S. Ct. 1508).

Relying on *Clark County*, the Fifth Circuit emphasized that the plaintiff in *Mauder* requested FMLA leave *after* he was notified of his corrective action plan that would result in his termination on October 11, 2002 if he did not make the requisite improvements. *Id.* The Fifth Circuit held that the employer "was not required to suspend Mauder's termination pending his FMLA filing" and that the case "lack[ed] the requisite temporal proximity or substantive evidence to support a finding of retaliation," even though the plaintiff was terminated eight days before the deadline to submit his FMLA application. *Id.* at 585.

Here, like in *Clark County* and *Mauder*, the investigation into Lucas' actions began on May 8, 2023, two weeks before she sent the FMLA leave request email on May 23, 2023. On May 8, Wagner told Melton to investigate and "hold accountable if confirmed." [48], Ex. 1 at p. 48. On May 10, Wagner said, "We can look at everything when investigation is complete, but looking like termination." *Id.* at p. 45. He recommended terminating Lucas on May 11, and Melton confirmed on May 12 that she would carry out the termination on May 15. *See id.* at p. 111-12. Like in *Clark County* and *Mauder*, the adverse employment decision at issue was finalized before Allegiance was aware of Lucas' intent to take FMLA leave, and Allegiance was not required to suspend the decision after learning of her intent to take leave. Accordingly, even if Lucas could establish that she was protected by the FMLA, she cannot demonstrate a causal connection between her FMLA

request and termination for prima facie purposes or at the pretext stage. Summary judgment is therefore GRANTED as to Lucas' retaliation claim.

### III. *FMLA Interference*

The FMLA additionally makes it unlawful for any employer to "interfere with, restrain, or deny" the exercise of any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). "For an employee to establish a prima facie interference claim, the employee must show: "(1) [she] was an eligible employee; (2) [her] employer was subject to FMLA requirements; (3) [she] was entitled to leave; (4) [she] gave proper notice of [her] intention to take FMLA leave; and (5) [her] employer denied [her] the benefits to which [she] was entitled under the FMLA." *DeVoss* v. *Southwest Airlines Co.*, 903 F.3d 487, 490 (5th Cir. 2018) (quoting *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017)).

Allegiance argues that Lucas' interference claim fails because it is predicated on the same alleged action—the termination of her employment—and therefore not legally distinguishable from her retaliation claim. *See Spears v. La. Dep't of Pub. Safety and Corr.*, 2 F. Supp. 3d 873, 878 (M.D. La. 2014) ("[B]ecause of the similarity between the evidence for FMLA retaliation and FMLA interference when the interference claimed is termination or elimination of the position, many courts doubt the validity of these claims when styled as interference claims.") (citing *Varise v. H & E Healthcare, LLC*, 2012 WL 5997202 (M.D. La. Nov. 30, 2012)) (additional citations omitted).

Lucas responds that her interference claim is legally distinct from her retaliation claim "as it centers on Defendant's denial of Plaintiff's right to take FMLA leave, not punishment for exercising that right. . . . Far from duplicative, this claim targets Defendant's proactive step to thwart Plaintiff's leave[.]" [54] at p. 18. Lucas is correct that the "[t]he difference between an

interference and retaliation claim 'is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent.'" *Jiles v. Wright Medical Tech., Inc.*, 313 F. Supp. 3d 822, 844 (S.D. Tex. 2018) (quoting *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). But aside from the conclusory references to this distinction, Lucas' arguments in support of her interference claim are identical to those raised in support of her retaliation claim. *See Devoss*, 903 F.3d at 489 n. 1 (affirming dismissal of FMLA retaliation claim where plaintiff "fail[ed] to provide any structured argument [at district court or on appeal] supporting the assertion that her FMLA retaliation claim is in any way distinguishable from her FMLA interference claim.")

In any event, even if Lucas successfully distinguished her interference and retaliation claims, her interference claim fails because she cannot demonstrate that she was entitled to FMLA leave. Lucas points to no evidence that she suffered from a "serious health condition involving continuing treatment by a healthcare provider," which includes (1) a period of incapacity of more than three consecutive days, (2) any period of incapacity due to pregnancy or prenatal care, which is not at issue here, or (3) any period of incapacity or treatment for such incapacity due to a chronic serious health condition. *See* 29 C.F.R. § 825.115(a), (b), (c). As discussed at length above, Lucas points to no evidence that she was incapacitated for more than three consecutive days or by a chronic serious health condition. Lucas was therefore not entitled to FMLA leave.

*Conclusion*

For the reasons set forth above, Allegiance's Motion for Summary Judgment [48] is GRANTED. Lucas' Complaint [1] is DISMISSED *with prejudice*.

A Final Judgment consistent with this Order and Memorandum Opinion will issue this day. This CASE is CLOSED.

SO ORDERED, this the 28th day of July, 2025.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE